UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RUSTEM NURLYBAYEV, Individually and
On Behalf of All Others Similarly Situated,

                                        Plaintiff,

        v.

ZTO EXPRESS (CAYMAN) INC., MEISONG
LAI, JIANFA LAI, JILEI WANG,
XIANGLIANG HU, BAIXI LAN, ZING LIU,
FRANK ZHEN WEI, and JIANMIN (JAMES)
GUO, J.P. MORGAN SECURITIES LLC,
CREDIT SUISSE SECURITIES (USA) LLC,
CITIGROUP GLOBAL MARKETS INC.,
CHINA RENAISSANCE SECURITIES
(HONG KONG) LIMITED, GOLDMAN
SACHS (ASIA) L.L.C., AND MORGAN
STANLEY & CO. INTERNATIONAL PLC,

                                        Defendants.

Case No. 1:17-cv-06130-LTS-SN

**AMENDED CLASS ACTION
COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF ACTION.....................................................................................1

III.    JURISDICTION AND VENUE ............................................................................5

IV.     PARTIES ...............................................................................................................6

V.      FACTUAL BACKGROUND ...............................................................................10

      A.      Background of ZTO's Business.................................................................10

      B.      Defendants' False and Misleading Registration Statement and Prospectus ..........12

      C.      Partial Truth Begins to Emerge................................................................22

VI.     CLASS ACTION ALLEGATIONS ....................................................................30

FIRST CAUSE OF ACTION  FOR VIOLATION OF § 11 OF THE 1933 ACT AGAINST ALL
      DEFENDANTS ....................................................................................................32

SECOND CAUSE OF ACTION  FOR VIOLATION OF § 12(A)(2) OF THE 1933 ACT
      AGAINST ALL DEFENDANTS .........................................................................33

THIRD CAUSE OF ACTION  FOR VIOLATION OF § 15 OF THE 1933 ACT AGAINST ZTO
      AND THE INDIVIDUAL DEFENDANTS ........................................................34

PRAYER FOR RELIEF ..................................................................................................34

JURY DEMAND ..............................................................................................................35

## I.      INTRODUCTION

1.      Lead Plaintiff, the Wong Family Trusts, and Dongna Fang, additional plaintiff, individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys allege the following based upon personal knowledge as to Plaintiff and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ZTO Express (Cayman) Inc. ("ZTO". or the "Company"), as well as media and analyst reports about the Company and Company press releases.  Plaintiffs believe that, after a reasonable opportunity for discover, substantial additional evidentiary support will exist for the allegations set forth herein, against Defendants ZTO, Meisong Lai, Jianfa Lai, Jilei Wang, Xiangliang Hu, Baixi Lan, Xing Liu, Frank Zhen Wei, Jianmin (James) Guo, Morgan Stanley & Co. International plc, Goldman Sachs (Asia) L.L.C. China Renaissance Securities (Hong Kong) Limited, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, and J.P. Morgan Securities LLC.

## II.      SUMMARY OF ACTION

2.      Plaintiffs bring this securities class action on behalf of Plaintiffs and all persons who purchased or otherwise acquired ZTO American Depositary Shares ("ADS's") pursuant or traceable to the F-1 Registration statement and the incorporated and *in pari materia* F-6 registration statement and Prospectus (collectively, the "Registration Statement") issued in connection with ZTO' s October 2016 initial public stock offering (the "IPO" or "Offering") of approximately $1.4 billion of ADS's.

3.      The action asserts strict liability claims under §§ 11, 12(a)(2) and 15of the Securities Act of1933 ("1933 Act") against ZTO, certain of ZTO's officers and directors, and the underwriters of the IPO.

4.     ZTO is an express delivery company in China.  The Company provides express delivery service through its nationwide network, as well as other value-added logistics services, to merchants on e-commerce platforms like Alibaba.  ZTO is headquartered in Shanghai, People's Republic of China and its ADS's are traded on the New York Stock Exchange under the ticker symbol "ZTO."

5.     On or around October 27, 2016, ZTO conducted the Offering, selling 72,100,000 ADS's at a price to the public of $19.50 per share.

6.     The Registration Statement contained untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading.  In violation of the Securities Act, Defendants negligently issued untrue statements of material facts and omitted to state material facts required to be stated in the Registration Statement and incorporated Prospectus that the Company filed with the SEC in support of the Offering.  Defendants are strictly liable for any and all material untrue statements or omissions in the Registration Statement.  Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about adverse conditions, risks, and uncertainties.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii).  Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew, or should have reasonably expected, would have a materially adverse impact on ZTO's business.  Defendants failed to fulfill this obligation as well.

7.     Among other things, the Registration Statement failed to disclose that less than two quarters before the IPO – in April of 2016 – ZTO had lowered its network transit fees to subsidize its network partners in response to increased operating costs, pricing pressure,

competition and other negative market conditions.  The Registration Statement further failed to disclose the consequent negative impact on ZTO's revenue, margins, earnings and forecasts.

8.     Related and unbeknownst to investors, the Registration Statement was materially untrue, inaccurate, misleading, and/or incomplete in that it failed to disclose that it had inflated its claimed "superior" profit margins, profitability and cost leadership, far above industry norms by keeping segments of its business (its network partners) out of its financial statements, which were later-learned by investors to be low-margin, unsustainable and unstable.  As, ZTO lowered its network transit fees charged to these network, just ahead of the IPO, the impact on the claim of superior profit margins, and sustainability of those margins, was all the more misleading.

9.     The Registration Statement also failed to disclose that transportations costs were out of control and increasing as ZTO went into its IPO, requiring ZTO to adopt a number of measures in the first quarter of 2017, including increased reliance on ZTO's own vehicle capacity and use of its own self-owned and self-operated distribution centers to arrange pick-up and drop-off by ZTO itself – the effect of which was to lower ZTO profit margins by having to pick up this low margin business and put it on its own books.  These increased costs also included the fact that the Company was unable to recruit and train enough qualified drivers in a timely manner, requiring the Company to rely more on third-party trucking capacity as it went into its IPO during the fourth quarter of 2016.

10.    The Registration Statement also failed to disclose that ZTO was subsidizing and knew that it would have to subsidize its last-mile delivery service franchisees, as it was paying substandard and unsustainable compensation. The Registration Statement also failed to disclose that, because of this unsustainable compensation, that there was a material likelihood that ZTO would be forced, in the near future –  just as it attempted jointly with competitor in 2015

unbeknownst to investors – to provide a last-mile fee adjustment. Not surprisingly, this last-mile fee adjustment was announced just months later in March of 2017, along with the other industry competitors with whom it attempted to rectify this dire situation in 2015.  The Registration Statement also failed to disclose that ZTO provided subsidies for secondary network transit fees and delivery outlets located in remote areas.

11.     Defendants were required to disclose this material information in the Registration Statement for at least three independent reasons.  First, SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), requires disclosure of any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to cause ZTO's disclosed financial information not to be indicative of future operating results.  The already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by ZTO, the lowered network transit fees and other subsidies from ZTO to its network partners, and the consequent negative impact on ZTO's revenue, margins, earnings and forecasts were likely to (and in fact did) materially and adversely affect ZTO's future results and prospects, and thus were required to be disclosed in the Registration Statement under Item 303.

12.     Second, SEC Regulation S-K, 17 C.F.R § 229.503 ("Item 503"), requires, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the Offering risky or speculative and that each risk factor adequately describe the risk. ZTO's discussions of risk factors did not adequately describe the risks posed by the already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by ZTO, the lowered network transit fees and other subsidies from ZTO to its network partners, or the consequent negative impact on ZTO's revenue, margins, earnings and forecasts.

- 4 -

13.     Third, Defendants' failure to disclose the already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by ZTO, the lowered network transit fees, the unsustainable compensation paid to last-mile network partners, and other subsidies from ZTO to its network partners--- and the consequent negative impact on ZTO's revenue, margins, earnings and forecasts,--- rendered false and misleading the Registration Statement's many statements highlighting  ZTO' s revenues, margins and purportedly advantageous business model, as well as the Registration Statement's many references to known risks that, "*if*" they occur, "*may*" adversely affect the Company.  In truth, these "risks" had already materialized at the time of the IPO and already were affecting, and would continue to negatively affect, the Company's business and prospects.

14.     With these misrepresentations and omissions, the IPO was extremely lucrative for Defendants, who raised more than $1.4 billion in gross proceeds.  Shortly after the IPO, however, the price of ZTO ADS's plummeted.  By the commencement of this action, ZTO ADS's had traded below $12 per share, a nearly 43% decline from the $19.50 per share offering price.  All told, investors suffered hundreds of millions of dollars in losses. And to prop up its stock price, ZTO implemented a wasteful program to spend up to $300 million of the IPO proceeds buying back its stock.

### III.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k and 77o).

16.     This Court has jurisdiction over this action pursuant to § 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

17.     Venue is properly laid in this District pursuant to § 22 of the Securities Act and 28 U.S.C. § 139 1(b) as a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## IV.     PARTIES

19.     Lead Plaintiff Wong Family Trusts purchased ZTO ADS's pursuant or traceable to the IPO Registration Statement and Prospectus and was damaged thereby.

20.     Additional Plaintiff Dongna Fang purchased ZTO ADS's pursuant or traceable to the IPO Registration Statement and Prospectus and was damaged thereby.

21.     Defendant ZTO is a Chinese logistics company, akin to FedEx or UPS, that provides shipping and delivery services in China to merchants on e-commerce platforms like Alibaba.  ZTO is headquartered in Shanghai, People's Republic of China and incorporated in the Cayman Islands.  Its ADS shares are traded on the NYSE under the ticker symbol "ZTO."

22.     Defendant Meisong Lai ("M. Lai") was, at all relevant times, ZTO's Chief Executive Officer and the Chairman of ZTO's Board of Directors.  Defendant M. Lai signed, or authorized the signing of, the Registration Statement.

23.     Defendant Jianmin (James) Guo was, at all relevant times, ZTO's Chief Financial Officer.  Defendant Guo signed, or authorized the signing of, the Registration Statement.

24.     Defendant Jianfa Lai ("J. Lai") was, at all relevant times, a member of ZTO's Board of Directors.  Defendant J. Lai signed, or authorized the signing of, the Registration Statement.

25.     Defendant Jilei Wang was, at all relevant times, a member of ZTO's Board of Directors.  Defendant Wang signed, or authorized the signing of, the Registration Statement.

26.     Defendant Xiangliang Hu was, at all relevant times, a member of ZTO's Board of Directors.  Defendant Hu signed, or authorized the signing of, the Registration Statement.

27.     Defendant Baixi Lan was, at all relevant times, a member of ZTO's Board of Directors.  Defendant Lan signed, or authorized the signing of, the Registration Statement.

28.     Defendant Xing Liu was, at all relevant times, a member of ZTO's Board of Directors.  Defendant Liu signed, or authorized the signing of, the Registration Statement.

29.     Defendant Frank Zhen Wei was, at all relevant times, a member of ZTO's Board of Directors.  Defendant Wei signed, or authorized the signing of, the Registration Statement.

30.     The defendants named in ¶¶2l-29 (M. Lai, Guo, J. Lai, Wang, Hu, Lan, Liu, and Wei) are referred to herein as the "Individual Defendants."  The Individual Defendants each participated in the preparation of, and signed (or authorized the signing of) the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement and/or attended roadshows and other promotions to meet with and present favorable information to potential ZTO investors, all motivated by their own and the Company's financial interests. Defendant ZTO and the Individual Defendants who signed (or authorized the signing of) the Registration Statement are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement.

31.     Defendant Morgan Stanley & Co., International plc ("Morgan Stanley") is a financial services company that acted as an underwriter for ZTO's IPO, helping to draft and

- 7 -

disseminate the Registration Statement and solicit investors to purchase ZTO securities issued pursuant thereto.  In the Offering, Morgan Stanley agreed to purchase 20,909,000 ADS's.

32.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is a financial services company that acted as an underwriter for ZTO's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase ZTO securities issued pursuant thereto.  In the Offering, Goldman Sachs agreed to purchase 18,025,000 ADS's.

33.     Defendant China Renaissance Securities (Hong Kong) Limited ('China Renaissance") is a financial services company that acted as an underwriter for ZTO's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase ZTO securities issued pursuant thereto. In the Offering, China Renaissance agreed to purchase 7,210,000 ADS's.

34.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company that acted as an underwriter for ZTO's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase ZTO securities issued pursuant thereto. In the Offering, Citigroup agreed to purchase 8,652,000 ADS's.

35.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company that acted as an underwriter for ZTO's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase ZTO securities issued pursuant thereto. In the Offering, Credit Suisse agreed to purchase 7,210,000 ADS's.

36.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a financial services company that acted as an underwriter for ZTO's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase ZTO securities issued pursuant thereto. In the Offering, Credit Suisse agreed to purchase 10,094,000 ADS's.

37.     Defendants Morgan Stanley, Goldman Sachs, China Renaissance, Citigroup, Credit Suisse, and J.P. Morgan, named above in ¶¶30-36 are referred to collectively herein as the "Underwriter Defendants."  Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

38.     The Underwriter Defendants are investment banking houses that specialize, inter alia, in underwriting public offerings of securities.  They served as the underwriters of the IPO and shared over $45 million in fees collectively.  The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from ZTO, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

39.     Representatives of the Underwriter Defendants also assisted ZTO and the Individual Defendants in planning the IPO, and were required to conduct an adequate and reasonable investigation into the business and operations of ZTO, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning ZTO's operations and financial prospects.

40.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with ZTO's lawyers, management and top executives and engaged in "drafting sessions" between at least June 2016 and October 2016.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which ZTO ADS's would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures

- 9 -

about ZTO would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and ZTO's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, ZTO's existing problems as detailed herein.

41.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the offer and sales of the Company's ADS's pursuant and/or traceable to the Offering and relevant Registration Statement and Prospectus, including to Plaintiffs and the Class (defined below).

42.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the untrue and misleading statements in the Offering's Registration Statement and Prospectus.  The Underwriter Defendants' negligent due diligence investigation was a substantial factor leading to the harm complained of herein.

## V.    FACTUAL BACKGROUND

### A.    Background of ZTO's Business

43.    ZTO provides domestic and international express delivery services mainly in China for parcels weighting under 50 kilograms with expected delivery time ranging from 24 to 72 hours.  ZTO operates through a network partner model in which the network partners, operating under the ZTO brand, handle the delivery pickup, bring the packages to a regional hub owned and operated by ZTO.  ZTO handles the sorting and line-haul transportation between hubs.  Then, network partners transport and deliver the parcels to the recipients.  The following diagram from the Prospectus illustrates the model:



44.     As of June 30, 2016, ZTO had 3,541 direct network partners who have entered into cooperation agreements with us.  These agreements generally have a term of one or three years and the direct network partner may elect to renew the agreement upon expiration if it remains in the ZTO network.  ZTO's network partners pay ZTO recurring network transit fees

for the express delivery services ZTO provides to them.  The following chart illustrates the

network partner model and the flow of funds and parcels:



**B.      Defendants' False and Misleading Registration Statement and Prospectus**

45.      On June 23, 2016, ZTO filed with the SEC a confidential draft registration

statement on Form F-1, which, incorporating and in combination with related documents on

Form F-6 and filed pursuant to Rule 424(b)(4), would be used for the IPO following a series of

amendments in response to SEC comments, including comments from the SEC emphasizing the

importance of adequately disclosing material trends and risk factors, as required by Items 303

and 503.

46.      On October 24, 2016, ZTO filed its final amendment to the Registration

Statement, which registered over 82 million ZTO shares for public sale.  The SEC declared the

Registration Statement effective on October 26, 2016.  ZTO priced the IPO at $19.50 per share

and filed the final Prospectus for the IPO, which forms part of the Registration Statement.

Through the IPO, defendants issued and sold over 72 million ADS's, generating over $l.36 billion for Defendants.

47.     The Registration Statement and Prospectus, contained untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading.  For example, the Prospectus Summary begins with the highlights ZTO's superior profitability and "one of the highest" profit margins compared to its competitors:

> **Our Business**
>
> We are a leading express delivery company in China and one of the largest express delivery companies globally, in terms of total parcel volume in 2015, according to the iResearch Report. We have demonstrated the fastest growth rate among the top five Chinese express delivery companies as of December 31, 2015, with our annual parcel volume growing at a compounded annual growth rate, or CAGR, of 80.3% between 2011 and 2015, during which we recorded consecutive annual increases in market share. See "Business—Business Overview" for more information on our annual parcel volume in each year between 2011 and 2015. **We have achieved superior profitability along with our rapid growth.  Our operating margin, which is the ratio of our income from operations to revenues, in 2015 was 25.1%, which was one of the highest among the major publicly listed logistics companies globally.**

48.     Similarly, the Management Discussion and Analysis of Financial Condition and Results of Operation, in the Registration Statement and Prospectus begins with this same language:

> **Overview**
>
> We are a leading express delivery company in China and one of the largest express delivery companies globally, in terms of total parcel volume in 2015, according to the iResearch Report. We have demonstrated the fastest growth rate among the top five Chinese express delivery companies as of December 31, 2015, with our annual parcel volume growing at a compounded annual growth rate, or CAGR, of 80.3% between 2011 and 2015, during

which we recorded consecutive annual increases in market share. See "Business—Business Overview" for more information on our annual parcel volume in each year between 2011 and 2015. **We have achieved superior profitability along with our rapid growth.  Our operating margin, which is the ratio of our income from operations to revenues, in 2015 was 25.1%, which was one of the highest among the major publicly listed logistics companies globally.**

49.     So too does the Business section of the of the Registration Statement and

Prospectus:

### Business Overview

We are a leading express delivery company in China and one of the largest express delivery companies globally, in terms of total parcel volume in 2015, according to the iResearch Report. We have demonstrated the fastest growth rate among the top five Chinese express delivery companies as of December 31, 2015, with our annual parcel volume growing at a CAGR of 80.3% between 2011 and 2015, during which we recorded consecutive annual increases in market share.  **We have achieved superior profitability along with our rapid growth.  Our operating margin in 2015 was 25.1%, which was one of the highest among the major publicly listed logistics companies globally.**

50.     The Competition section of the Registration Statement and Prospectus similarly

highlights ZTO's superior operational capabilities and cost leadership:

The express delivery industry in China is fragmented and we compete primarily with leading domestic express delivery companies including YTO Express, STO Express, Yunda Express, SF Express and EMS.  We also face competition from emerging players in our industry or existing players in an adjacent market who choose to leverage their existing infrastructure and expand their services into express delivery.  **As a leading and the fastest growing express delivery company in China, we believe that our innovative shared success system, superior operational capabilities and cost leadership as well as our quality service provide us with a competitive advantage**.

51.     However, Registration Statement and Prospectus contained untrue statements of

material fact and omitted to state material facts both required by governing regulations and

- 14 -

necessary to make the statements made not misleading in that they failed to disclose that, just one to two quarters before the IPO, ZTO had materially lowered its network transit fees to subsidize its network partners in response to increased operating costs, pricing pressure, competition and other negative market conditions.  By lowering these fees just before the IPO, while touting its margins, investors were deceived.

52.     The Registration Statement also failed to disclose that transportations costs were out of control and increasing, requiring ZTO to adopt a number of measures in the first quarter of 2017, including increased reliance on ZTOs own vehicle capacity and use of its own self-owned and self-operated distribution centers to arrange pick-up and drop-off by ZTO itself – the effect of which was to lower ZTO profit margins by having to pick up this low margin business and put it on its own books.  These increased costs also included the fact that the Company was unable to recruit and train enough qualified drivers in a timely manner, requiring the Company to rely more on third-party trucking capacity as it went into its IPO during the fourth quarter of 2016.

53.     The Registration Statement also failed to disclose that ZTO knew that it was materially likely ZTO would have to raise fees to or subsidize its last-mile delivery service franchisees, as it, along with its competitors, were paying unsustainable compensation to these partners and that it knew that it would be forced, in the near future, to provide a last-mile fee adjustment, which it eventually announced jointly in March of 2017, along with other industry competitors, with whom it attempted a similar adjustment in 2015, but failed.

54.     The Registration Statement also failed to disclose that, as a group, the competitors had attempted to jointly raise fees just one year earlier in 2015, but that the agreement had failed, leaving the last-mile partners in dire straits.  The Registration Statement and Prospectus also

- 15 -

failed to disclose that it was already providing subsidies for secondary network transit fees and delivery outlets located in remote areas.

55.     The Registration Statement also failed to disclose that ZTO was misleadingly inflating its stated profit margins by keeping its network partners out of its financial statements (unlike its competitors), and the materiality of the inflation margins compared to competitors. ZTO used a system of "network partners" to handle lower-margin pickup and delivery services, while maintaining ownership of core hub operations.  By keeping the "network partners" businesses off its own books, the Company was able to exaggerate its profit margins to investors, and more favorably compare its margins to competitors.  Yet, the Registration Statement and Prospectus further misleadingly highlighted and proclaimed the superiority of ZTO's operational efficiencies that resulted from the structure of using network partners instead of handling these services internally.  For example:

> *We have achieved superior profitability along with our rapid growth.  Our operating margin, which is the ratio of our income from operations to revenues, in 2015 was 25.1%, which was one of the highest among the major publicly listed logistics companies globally.*
>
> \* \* \*
>
> *We operate a highly scalable network partner model*, which we believe is best suited to support the significant growth of e-commerce in China.  We leverage our network partners to provide pickup and last-mile delivery services, while we control the mission-critical line-haul transportation and sorting network within the express delivery service value chain.  The network partner model is developed to reach and serve the Chinese ecommerce industry's fragmented and geographically dispersed merchant and consumer base and seasonal demand.  *It allows us to achieve strong operating leverage through minimizing fixed costs and capital requirements, consequently driving higher return on invested capital and equity*.
>
> \* \* \*

> During 2014 and 2015, we acquired the express delivery business and assets of selected network partners in exchange for cash and/or our ordinary shares in order to optimize our nationwide network.

56.     Notably, the Registration Statement admits that express delivery service provided to its network partners constituted ZTO's primary revenue source without disclosing that, two quarters before the IPO, ZTO had the lowered its network transit fees, which had already negatively impacted this critical revenue source, and that by keeping them off its books it artificially inflates its superior margins and competitiveness.  For example, the Registration Statement stated as follows:

> ***We derive substantially all of our revenues from express delivery services that we provide to our network partners***, which mainly include parcel sorting and line-haul transportation.  We charge our network partners [a] network transit fee for each parcel that is processed through our network.  Such fees represented 94.1%, 94.9%, 95.9% and 93.5% of our total express delivery services revenues in 2014, 2015 and the six months ended June 30, 2015 and 2016, respectively . . . .

> ***Our revenues are primarily driven by our parcel volume and the network transit fee we charge our network partners for each parcel going through our network***.

>    *   *   *

> We determine the level of pricing of our network transit fee based on the operating costs of our business while also considering other factors including market conditions and competitions as well as our service quality.  The network transit fees we charge our network partners are primarily measured by (i) a fixed amount for a waybill attached to each parcel and (ii) a variable amount per parcel for sorting and line-haul transportation based on the parcel weight and route.  The delivery service fees we charge the enterprise customers are also based on parcel weight and route.

>    *   *   *

> ***The principle source of our revenue consisted of network transit fees derived from sorting and line haul transportation services provided to the pickup outlets operated by our: network partners***.

- 17 -

57.     The Registration Statement also misleadingly highlighted ZTO's growth, profitability and other business and financial results, while failing to disclose the already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by ZTO, the lowered network transit fees and other subsidies from ZTO to its network partners, and that the consequent negative impact on ZTO's revenue, margins, earnings and forecasts was likely to (and in fact did) materially and adversely affect ZTO's future results and prospects.  For example, the Registration Statement stated as follows:

> *We have achieved significant growth and profitability*.  Our total parcel volume increased from 279 million in 2011 to 2,946 million in 2015 and from 1,185 million in the six months ended June 30, 2015 to 1,913 million in the same period in 2016.  Our total parcel volume in the nine months ended September 30, 2016 was 3,015 million, compared to 1,917 million in the same period in 2015.  Our revenues increased from RMB3.9 billion in 2014 to RMB6.1 billion (US$915.8 million) in 2015 and from RMB2.5 billion in the six months ended June 30, 2015 to RMB4.2 billion (US$638.8 million) in the same period in 2016.  ***We generated operating profit of RMB600.3 million and RMB1.5 billion (US$230.1 million) and our operating profit margin was 15.4% and 25.1% in 2014 and 2015, respectively.  We generated operating profit of RMB579.9 million and RMB1.1 billion (US$159.0 million) and our operating profit margin was 23.3% and 24.9% in the six months ended June 30, 2015 and 2016, respectively***.
>
> *                    *                    *
>
> We are a leading express delivery company in China and one of the largest express delivery companies globally, in terms of total parcel volume in 2015, according to the iResearch Report.  We have demonstrated the fastest growth rate among the top five Chinese express delivery companies as of December 31, 2015, with our annual parcel volume growing at a compounded annual growth rate, or CAGR, of 80.3% between 2011 and 2015, during which we recorded consecutive annual increases in market share.  ***We have achieved superior profitability along with our rapid growth.  Our operating margin in 2015 was 25.1%, which is the ratio of our income from operations to revenues, which was one of the highest among the major publicly listed logistics companies globally.***

58.     The Registration Statement also misleadingly highlighted the purported advantages of ZTO's "network partner" and "shared success" business model, while downplaying the actual and potential negative risks to ZTO's business and financial results, as exemplified by the need to lower service fees ahead of the IPO, the need to keep this low profit segment off its books, the need to bring more of this delivery service in-house or to contract it out to expensive third-parties, and the knowing need to subsidize the network partners.  For example, the Registration Statement stated as follows:

> *Operational efficiency and cost management are critical to the success of an express delivery business.  We have achieved strong operational efficiency* through centralized control and management of 74 sorting hubs and a fleet of over 3,300 trucks, route planning and optimization, as well as our proprietary waybill tracking system and transportation management system.  *Our operational efficiency and economies of scale have resulted in our cost leadership with unit cost per parcel.*

> *             *             *

> *We operate a highly scalable network partner model*, which we believe is best suited to support the significant growth of e-commerce in China.  *We leverage our network partners to provide pickup and last-mile delivery services*, while we control the mission-critical line-haul transportation and sorting network within the express delivery service value chain.  The network partner model is developed to reach and serve the Chinese e-commerce industry's fragmented and geographically dispersed merchant and consumer base and seasonal demand.  *It allows us to achieve strong operating leverage through minimizing fixed costs and capital requirements, consequently driving higher return on invested capital and equity*.

> *We have established a distinctive "shared success" system, which enables us to align the interests of our network partners, management and employees with ours through a reward and risk sharing mechanism.  This shared success system incentivizes our network partners to maximize their growth and profitability and strengthens their loyalty to our ZTO brand and business*.

- 19 -

59.     The Registration Statement also misleadingly downplayed true nature and impact of competition to ZTO's business and financial results, failing to disclose that increased operating costs, pricing pressure and competition had already caused, or was materially likely to cause in the near future, ZTO to subsidize its network partners with lowered network transit fees. The Registration Statement, in so discussing the competition, failed to disclose the previous failed attempt to reach agreement with these competitors to raise last-mile delivery partner fees to maintain and increase profitability. For example, the Registration Statement stated as follows:

> We operate in a highly competitive and fragmented industry. We compete primarily with leading domestic express delivery companies including SF Express, STO Express, YTO Express, Yunda Express as well as EMS.  We compete with them based on a number of factors, including business model, operational capabilities, cost control and service quality.

60.     The Registration Statement also falsely warned of numerous risks that, "*if*" they occur, "*may*" adversely affect the Company while failing to disclose that these very "risks" had already materialized at the time of the IPO.  For example, the Registration stated:

- "*If* we are not able to effectively control our cost and adjust the level of network transit fees based on operating costs and market conditions, our profitability and cash flow *may* be adversely affected."

- "*If* we and our network partners cannot effectively control our costs to remain competitive, our market share and revenue *may* decline."

- "[W]e have historically experienced declines in the delivery service market prices and *may* face downward pricing pressure again."

- "*[I]f* we have to subsidize our network partners to increase our network partners' competitiveness, our gross margin *may* decline."

61.     The statements above were materially false and misleading as noted above.  In summary, ZTO was already failing to effectively control its network fees and other operating costs. ZTO was already negatively affected by competition, downward pricing pressure and other market conditions.  ZTO was already subsidizing network partners through lowered network

- 20 -

transit fees, and would need to further subsidize these partners to continue sustainably serve ZTO.  ZTO's revenues, margins, forecasts and other financial metrics were already suffering as a result.  ZTO was improperly inflating its stated profit margins, or hiding the material reasons for its high comparative margins, by keeping certain low-margin segments of its business out of its financial statements.  ZTO used a system "network partners" to handle lower-margin pickup and delivery services, while maintaining ownership of core hub operations.  By keeping the "network partners" businesses off its own books, and failing to disclose their materially weak margins, the Company was able to exaggerate its profit margins to investors.

62.     Beyond the foregoing affirmatively false and misleading statements of material fact, defendants were required to disclose all of this misrepresented and omitted information in the Registration Statement for at least three independent reasons.  First, Item 303 requires disclosure of any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to cause ZTO's disclosed financial information not to be indicative of future operating results.  The already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by ZTO, the lowered network transit fees and other subsidies from ZTO to its network partners, and the consequent negative impact on ZTO's revenue, margins, earnings and forecasts were likely to (and in fact did) materially and adversely affect ZTO's future results and prospects.

63.     Second, Item 503 requires, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk.  ZTO's discussions of risk factors did not even mention, much less adequately describe, the risks posed by the already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by

ZTO, the lowered network transit fees and other subsidies from ZTO to its network partners, and the consequent negative impact on ZTO's revenue, margins, earnings and forecasts.

64.     Third, Defendants' failure to disclose the already-occurring increased operating costs, pricing pressure, competition and other negative market conditions faced by ZTO, the lowered network transit fees and other subsidies from ZTO to its network partners, and the consequent negative impact on ZTO's revenue, margins, earnings and forecasts, rendered false and misleading the Registration Statement's many statements touting ZTO's revenues, margins and purportedly advantageous business model, as well as the Registration Statement's many references to known risks that, "*if*" they occur, "***may***" adversely affect the Company.  These "risks" had already materialized at the time of the IPO.

65.     With these misrepresentations and omissions, the IPO was extremely lucrative for defendants, who raised more than $1.4 billion in gross proceeds.

## C.     Partial Truth Begins to Emerge

66.     ZTO's shares started trading on the October 27, 2016.  Almost immediately after the offering commenced, the Financial Times reported that an analyst speculated that margins were "clearly inflated":

> Companies in ZTO's hugely competitive industry ship high volumes with razor thin margins.  ZTO has drawn attention — and some skepticism — for announcing high profit margins compared with peers.
>
> * * *
>
> ZTO's prospectus said its net profit margin was 21.9 percent in 2015, far above industry peers.  SF Express, for example, had a net profit margin of 6.3 percent, while YTO had a 3.4 percent margin.
>
> Ms. Yao [an industry analyst] said **she believed ZTO's profit margin of 21.9 percent was "clearly inflated" as courier companies typically make a 5 percent margin per delivery**. Mr. Guo [ZTO's CFO] attributed the higher margins to a

combination of cost-saving measures, including using more in-house delivery trucks and automated sorting equipment, and the nature of the business model.  As had been speculated ahead of the listing, ZTO does not count the revenues of its partners that typically handle pick and delivery services while core hub operations are directly owned and operated by the company.  That would result in much lower revenue and hence much higher profit ratio.

67.      By the end of the first day of trading on October 17, 2017, ZTO's stock price was down 15% to $16.57.  On November 23, 2017, Defendant J.P. Morgan's analyst continued to tout ZTO's "operating margin of 25% in 2015 [as being] one of the highest within the company's main peer group (compared to 13% for YTO, 17% for Yunda, and 4% for SF) trailing only STO's 28%."  However, by January 6, 2017, as other analysts began to question ZTO's superior profit margins, ZTO's stock price had plummeted 33%.  Morgan Stanley's analyst tried to down play this skepticism, and support ZTO's price on January 6, 2017, stating:

> Given its robust business operations in 3Q16, **we think the 33% share price correction since IPO was led by market skepticism at ZTO's superior margins** and growth potential, which require further demonstration in the coming quarters […] Regarding the recent share price weakness, we believe this is a result of weak market sentiment and lack of confidence in the company. However, we expect further delivery of solid results to resolve market concern about the stock over the longer term.

68.      Then, on February 27, 2017, ZTO announced disappointing fourth quarter 2016 financial results.  Among other things, ZTO reported that its quarterly "cost of revenues" had increased 49.8% year-over-year and that purportedly "[t]he increase primarily resulted from increases in line-haul transportation costs, sorting hub operating costs, and cost of accessories." ZTO further disclosed that its "[g]ross margin decreased to 36.4% from 38.1% in the same period last year, mainly attributable to the increase in line-haul transportation cost."

69.     On this news, market analysts reacted negatively.  For example, analysts with J.P.

Morgan lowered their ZTO price target, reacting to ZTO's disappointing margins and other

financial metrics as follows:

> We are turning more cautious on ZTO's 2017 financial outlook
> due to soft 1Q revenue guidance and *weaker-than-expected 4Q*
> *margins*. . . . Although the industry volume growth outlook
> remains solid . . . we see increasing *margin risk* on rising
> transportation costs, while we believe the fast growth of the local
> food delivery market could add pressure to network partners' labor
> supply.  *We expect the shares to react negatively* . . . .

70.     On or about March 10, 2017, Morgan Stanley noted that "ZTO's shares stumbled

11% over investors' concerns about recent labor issues that disrupted operations of competitors."

As Morgan Stanley revealed:

> *A significant number of last-mile franchisees are losing money*,
> as highlighted in recent media reports (Sina.com, Sohu.com) of
> delivery outlet bankruptcies in Beijing (YTO) and Shanghai
> (STO).  Although these outlets are not a part of ZTO, the
> bankruptcies *may imply a notable risk of price competition and*
> *general deteriorating financial conditions of ZTO's franchisees*

71.     On or about May 12, 2017, Defendants J.P. Morgan issued a private report, that

was made public four days later, confirming the deteriorated financial condition of ZTO's

franchisees. J.P. Morgan revealed that, just one day earlier, ZTO, along with five other

competitors, including all Tongda operators and TTK Express, jointly raised the fee paid to the

last-mile delivery operators by to be effective June 1, 2017.  The "intention" for the fee hike,

which J.P. Morgan claimed would be borne by consumers, was "*to improve the profitability of*

*last-mile delivery partners which are strugglin*g . . . ."  This agreement amongst competitors

revealed that, ahead of the IPO, Defendants were aware that the last-mile partners' profitability

was being unsustainably squeezed.  Then, J.P. Morgan also revealed, also unbeknownst to

investors, that as recent as 2015, ZTO and its competitors had attempted to implement a similar

fee hike to help their last-mile franchisees, but that the agreement feel apart:

> **Implementation remains a question mark in a prisoner's dilemma.**  There was a similar industry attempt to increase last-mile delivery fee among the same six companies in 2015. However, it turned out that cooperation among the six partners was not achieved.  Nonetheless, we think cooperation is more likely this time, given that some peers (e.g. YTO) have issues in terms of network partner profitability and stability.

JP Morgan further noted the importance of this "cooperation between the six competitors" as

necessary to improve profitability:

> **A successful cooperation could lead to potential price cooperation and raise industry profitability in the long run.**  If the cooperation this time is achieved and generates positive outcomes for all participates, we believe it's likely for them to have further cooperation on pricing.  We estimate the combined market share in terms of parcel volume for these six companies was approximately 50%-60% in 2016 (or 70-80% of Taobao/Tmall ecosystem).  ***Cooperation between the six could change industry price mechanism and improve profitability***.

Nowhere in the Registration Statement and Prospectus did Defendants disclose the known

squeeze on network partners prior to the IPO, nor the attempts at cooperation amongst the six

competitors necessary to maintain or improve profitability.

72.     On May 17, 2017, ZTO announced its Q1, 2017 revenue and earnings with

margins plummeting across the board, as shown in these slides from ZTO's earnings call:





73.     During a May 17, 2017 conference call with ZTO investors and analysts, in response to a question from Morgan Stanley analyst Edward Zhu, defendants Lai and Guo admitted that ZTO **had already lowered its network transit fees two quarters before the IPO**, which pre-IPO subsidies rendered ZTO's year-over-year results "**not directly comparable**," stating as follows:

> EDWARD ZHU, ANALYST, MORGAN STANLEY: (Spoken in Chinese)
>
> **So my first question is about your GP margin, we see that in the first quarter GP margin still declined**, although the revenue increased dramatically and the net profit was pretty good. So, what's your target for the GP margin for this year? Specifically, what does the fuel cost account for your total cost, in your cost structure?  **And also, the increase of the last mile delivery fee, will that cost be borne by the headquarter?  Would you be giving some subsidies for the first mile franchisees for this?**  First question.

\*       \*       \*

MEISONG LAI: (Spoken in Chinese)

JAMES GUO: So the first question is about the gross margin in Ql. The Chairman says – ***first of all, I would like to point out that the gross margin in Q1 this year and last year are not directly comparable. The reason is that, during the second quarter of last year, we lowered the network transit fees we charge our network partners, and the change in the pricing has led to a reduction in transit fee revenue per package.*** So, because of this change, the quarterly revenue generated during the second quarter of last year is not comparable with that in the previous period.

***And such pricing policy will change in April last year, so the apple-to-apple comparisons will begin during the second quarter of this year*** . . . .

74.     Defendant Guo continued to reveal that ZTO had a heavy reliance on third-party logistics vehicles requiring it to, immediately after the IPO, to increase self-owned and self-operated vehicles, but was unable to recruit and train drivers in a timely manner.  This required ZTO, during the IPO quarter, to rely heavily on costly third-party trucking capacity.  Moreover, ZTO had apparently found it necessary during the IPO quarter, if not sooner, to move into its own franchisee low margin business as it had begun handing the pickup and drop off business to utilize excess vehicle capacity.  Defendant Guo stated:

In terms of the transportation cost control, we adopted a number of measures during the first quarter of 2017, which are gradually taking hold, these measures include first, controlling the costs of third-party logistics vehicles. ***We increased the number of self-owned vehicles and optimize the transportation routes to replace third-party trucking companies . . . .***

***The third-party outsourcing cost increased quickly, and while we have already bought more self-owned vehicles, we have not been able to recruit or no need to recruit or we have not been able to recruit and train enough qualified drivers in a timely manner. So we h***ad ***to rely more on third-party trucking capacity in Q4 last year.*** And this situation has significantly improved this year.

And second, we also control these companies' costs by adjusting their transportation routes; ***and third, we increased our vehicle capacity by effectively using our self-owned – self-operated distribution centers where we can arrange pickup and drop off times ourselves***.

75.     Defendant Gou also admitted the unsustainable squeeze ZTO had forced on its last-mile partners prior to the IPO and that it was now taking steps to rectify the problem, including admitting the reality that it expected it would have to, or already was providing subsidies to keep these partners from going under:

> ***The last mile, yeah, the last mile fee adjustment, the Chairman mentions and – raising the last mile fee in the networks can maintain the stability of the network and improve the benefits to the delivery personals and also promote sustainable development of the market.***
>
> ***And depending on the situation, we may provide small subsidies to some of these service outlets,*** but overall, the pickup outlets will have to bear the last mile delivery fee adjustment on their own.

76.     Along with these admissions, ZTO announced the appointment of a Chief Operating Officer, to address these issues and the buyback of shares, using $300 million of the IPO proceeds, over the next 12 months, to prop up its sinking stock price.

77.     Subsequent to the IPO, ZTO shares plummeted.  With each earnings call, ZTO's stock plummeted as the truth began to be revealed as illustrated in the following stock chart:



78.     By the commencement of this action, ZTO ADS's had traded below $12 per

ADS, a nearly 43% decline from the $19.50 per ADS offering price.  As a result, investors have

suffered hundreds of millions of dollars in losses.

## VI.     CLASS ACTION ALLEGATIONS

79.     Plaintiffs brings this class action on behalf of all persons who purchased or

otherwise acquired ZTO ADS's pursuant or traceable to the Registration Statement issued in

connection with the IPO (the "Class").  Excluded from the Class are Defendants and their

families, the officers and directors and affiliates of Defendants, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any

entity in which Defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time

and can only be ascertained through appropriate discovery, Plaintiffs believes that there are

hundreds of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by ZTO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

82.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

83.     Common questions of law and fa4t exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the 1933 Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

010714-11 1007814 V1

## FIRST CAUSE OF ACTION

### FOR VIOLATION OF § 11 OF THE 1933 ACT
### AGAINST ALL DEFENDANTS

85.     Plaintiffs incorporate ¶¶ 1-84 by reference.

86.     This Cause of Action is brought pursuant to § 11 of the 1933 Act, 15 U.S.C.

§ 77k, on behalf of the Class, against all defendants.

87.     The Registration Statement contained untrue statements of material fact, omitted

to state other facts necessary to make the statements made not misleading, and omitted to state

material facts required to be stated therein.

88.     Defendants are strictly liable to Plaintiffs and the Class for the misstatements and

omissions.

89.     None of the Defendants named herein made a reasonable investigation or

possessed reasonable grounds for the belief that the statements contained in the Registration

Statement were true and without omissions of any material facts and were not misleading.

90.     By reason of the conduct herein alleged, each defendant violated, and/or

controlled a person who violated, § 11 of the 1933 Act.

91.     Plaintiffs acquired ZTO ADS's issued pursuant to the Registration Statement.

92.     Plaintiffs and the Class have sustained damages.  The value of ZTO ADS's has

declined substantially subsequent to and due to Defendants' violations.

93.     At the time of their purchases of ZTO ADS's, Plaintiffs and other members of the

Class were without knowledge of the facts concerning the wrongful conduct alleged herein and

could not have reasonably discovered those facts prior to the disclosures herein.  Less than one

year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the

facts upon which this complaint is based to the time that Plaintiffs commenced this action.

Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## SECOND CAUSE OF ACTION

### FOR VIOLATION OF § 12(A)(2) OF THE 1933 ACT AGAINST ALL DEFENDANTS

94.     Plaintiffs incorporate ¶¶1-93 by reference.

95.     By means of the defective Prospectus, Defendants promoted and sold ZTO ADS's to Plaintiffs and other members of the Class.

96.     The Prospectus for the IPO contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and the other members of the Class who purchased ZTO ADS's pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

97.     Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs acquired ZTO ADS's.

98.     By reason of the conduct alleged herein, defendants violated § 12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased ZTO ADS's pursuant to the Prospectus sustained substantial damages in connection with their purchases of the ADS's.  Accordingly, Plaintiffs and the other members of the Class who hold ADS's issued pursuant to the Prospectus have the right to

rescind and recover the consideration paid for their shares, and hereby tender their ADS's to defendants sued herein.  Class members who have sold their ADS's seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

### FOR VIOLATION OF § 15 OF THE 1933 ACT
### AGAINST ZTO AND THE INDIVIDUAL DEFENDANTS

99.     Plaintiffs incorporate ¶¶1-98 by reference.

100.     This Cause of Action is brought pursuant to § 15 of the 1933 Act against all Defendants.

101.     The Individual Defendants were controlling persons of ZTO by virtue of their positions as directors and/or senior officers of ZTO.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of ZTO.  The Company controlled the Individual Defendants and all of ZTO's employees.

102.     ZTO and the Individual Defendants were each culpable participants in the violations of §§ 11 and 12(a)(2) of the 1933 Act alleged in the First and Second Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief rind judgment, as follows:

A.     An order certifying this as a class action, certifying Lead Plaintiff and the additional plaintiff as Class representative and appointing Plaintiffs' counsel as Class Counsel;

- 34 -

B.      Awarding damages in favor of Plaintiffs and the Class against all defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding equitable, injunctive or other relief, including disgorgement or restitution, as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs demand trial by jury.

DATED:  January 5, 2018                    Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By ____/s/ Jason A. Zweig_____
Jason A. Zweig, JZ-8107

555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
jasonz@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein
Peter E. Borkon
Danielle Charles
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001

- 35 -

reed@hbsslaw.com
peterb@hbsslaw.com
daniellec@hbsslaw.com

*Lead Counsel for Lead Plaintiff, Wong Family*
*Trusts*

James I. Jaconette
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
jamesj@rgrdlaw.com

Shawn A. Williams
David W. Hall
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile:  (415) 288-4534
shawnw@rgrdlaw.com
dhall@rgrdlaw.com

*Additional Counsel*

Thomas L. Laughlin, IV
Donald A. Broggi
Rhiana L. Swartz
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue,17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
rswartz@scott-scott.com

*Counsel for Dongna Fong*

- 36 -

**CERTIFICATE OF SERVICE**

I hereby certify that I am the ECF User whose ID and password are being used to electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Jason A. Zweig
JASON A. ZWEIG

010714-11 1007814 V1