UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

RUSTEM NURLYBAYEV, Individually and
On Behalf of All Others Similarly Situated,

        Plaintiffs,

  -v-                                                   No.  17 CV 6130-LTS-SN

ZTO EXPRESS (CAYMAN) INC., et al.,

        Defendants.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        Lead Plaintiffs Wong Family Trusts and Dongna Fang ("Plaintiffs"), bring this putative class action against Defendant ZTO Express (Cayman) Inc. ("ZTO"), its executive officers and directors (the "Individual Defendants"),[1] and its underwriters (the "Underwriter Defendants," together with ZTO, "Defendants"), alleging that the registration statement and prospectus filed in connection with ZTO's initial public offering of American Depository Shares (the "Offering Documents") omitted material information in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a), 77o.  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78v.  ZTO and the Underwriter Defendants now move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Class Action Complaint (docket entry no. 52, the "AC") for failure to state a claim upon which relief may be granted.  (Docket entry no. 60.)  The Court has considered thoroughly

---

[1]     The Individual Defendants have not yet appeared in this action.  ZTO and the Underwriter Defendants represent that the Individual Defendants have not yet been served.  (See docket entry no. 61 at 1 n.1.)

the arguments and submissions of the parties in connection with these motions.  For the reasons that follow, Defendants' motion to dismiss the AC is granted.

BACKGROUND

The following recitation of relevant facts is drawn from the AC, the well-pleaded factual content of which is taken as true for purposes of the instant motion practice, and from documents incorporated by reference into the AC.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

Defendant ZTO is an express delivery company headquartered in Shanghai, China.  (AC ¶ 4.)  ZTO operates through a network partner model in which independent network partner outlets, operating under the ZTO brand, pick up parcels from senders and deliver those parcels to a regional hub owned and operated by ZTO.  (AC ¶ 43.)  ZTO then sorts the parcels and transports them to the regional hub closest to the end recipient.  (Id.)  From there, another network partner outlet is responsible for last-mile delivery.  (Id.)  ZTO's network partners are paid a delivery service fee by parcel senders and, in turn, the pickup outlet pays ZTO a "network transit fee" for its sorting and transportation services.  (AC ¶ 44.)

On October 27, 2016, ZTO made an initial public offering ("IPO") of 72,100,000 American Depository Shares on the New York Stock Exchange at $19.50 per share, generating approximately $1.36 billion.  (AC ¶¶ 5, 46.)  In connection with its IPO, ZTO filed the Offering Documents with the Securities and Exchange Commission ("SEC").  (AC ¶ 46; see also docket entry no. 62, Musoff Decl. Ex. B ("Prospectus"), Ex. C ("Reg. Stmt.").)  The SEC declared the Offering Documents effective on October 26, 2016.  (AC ¶ 46.)  Among other things, the Offering Documents state:

- "We derive substantially all of our revenues from express delivery services that we provide to our network partners, . . . Our revenues are primarily driven by our

- parcel volume and the network transit fee we charge our network partners for each parcel going through our network. . . . The principle [sic] source of our revenue consisted of network transit fees derived from sorting and line haul transportation services provided to the pickup outlets operated by our network partners."  (AC ¶ 56; Prospectus at 74-75, 88; Reg. Stmt. at 74-75, 88.)

- "We have achieved superior profitability along with our rapid growth.  Our operating margin, which is the ratio of our income from operations to revenues, in 2015 was 25.1%, which was one of the highest among the major publicly listed logistics companies globally."  (AC ¶¶ 47-49, 55, 57; Prospectus at 1, 73, 110; Reg. Stmt. at 1, 73, 110.)

- "If we are not able to effectively control our cost and adjust the level of network transit fees based on operating costs and market conditions, our profitability and cash flow may be adversely affected."  (AC ¶ 60; Prospectus at 19; Reg. Stmt. at 20.)

- "If we and our network partners cannot effectively control our costs to remain competitive, our market share and revenue may decline."  (AC ¶ 60; Prospectus at 16; Reg. Stmt. at 17.)

- "[W]e have historically experienced declines in the delivery service market prices and may face downward pricing pressure again."  (AC ¶ 60; Prospectus at 16; Reg. Stmt. at 17.)

- "[I]f we have to subsidize our network partners to increase our network partners' competitiveness, our gross margin may decline."  (AC ¶ 60; Prospectus at 16; Reg. Stmt. at 17.)

Plaintiffs contend that these statements omit material factual information necessary to make the statements not misleading, and that ZTO was also required to disclose the omitted information pursuant to Items 303 and 503 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), § 229.503 ("Item 503").  Specifically, Plaintiffs allege that the Offering Documents did not disclose: (1) that ZTO had lowered its network transit fees in April 2016 (AC ¶¶ 7, 51, 73), (2) that transportation costs were "out of control" and increasing, requiring ZTO to increase its reliance upon costly third-party trucking companies in the fourth quarter of 2016 and utilize more self-owned and operated distribution centers in the first quarter of 2017 (AC ¶¶ 9, 52, 74), (3) that ZTO had previously attempted to negotiate with its competitors a last-mile fee

adjustment in 2015, which it ultimately announced in May 2017 (AC ¶¶ 10, 53-54, 71, 75), and (4) that ZTO was keeping its network partners' businesses off its own books (AC ¶ 55).

With respect to network transit fees, the Offering Documents state that there "have historically been declines in delivery service fees charged by our network partners," that ZTO "may face downward pricing pressure again," that ZTO has "been able to adjust the level of network transit fee[s] based on market conditions and operating costs," and that ZTO "may evaluate and adjust our service pricing from time to time." (Prospectus at 16, 19, 75, 117; Reg. Stmt. at 17, 20, 75, 117.) The Documents also provide ZTO's quarterly revenues and parcel volumes for 2015 and the first and second quarters of 2016. (See Prospectus at 83; Reg. Stmt. at 83.) As to transportation costs, the Offering Documents state that ZTO "must continually control our costs" to "maintain competitive pricing and enhance our profit margins," and that ZTO has "adopted various such measures and will continue to add new ones as necessary and appropriate," even though "the measures we have adopted or will adopt in the future may not be as effective as expected." (Prospectus at 18-19, 76; Reg. Stmt. at 19, 76.) The Documents also note that ZTO's line haul transportation costs increased by 64.1% in the first two quarters of 2016 as compared to the same period in 2015, consistent with an increase in parcel volume and "mainly attributable to increased costs . . . in outsourced transportation service, and increased costs . . . incurred by our self-owned fleet." (Prospectus at 79; Reg. Stmt. at 79.) Plaintiffs argue that these disclosures are either insufficient or misleading in light of Defendants' omission of material facts.

Plaintiffs argue that the omitted information was made public after ZTO's IPO in three separate disclosures. First, On February 27, 2017, ZTO announced its fourth quarter 2016 financial results, reporting that its quarterly cost of revenues had increased 49.8% year-over-

year, primarily as a result of increases in "line-haul transportation costs, sorting hub costs, and cost of accessories."  (AC ¶ 68; Musoff Decl. Ex. H at 3.)  ZTO also announced that its "[g]ross margin decreased to 36.4% from 38.1% in the same period last year, mainly attributable to the increase in line-haul transportation cost."  (AC ¶ 68; Musoff Decl. Ex. H at 3.)

Second, on or about May 12, 2017, J.P. Morgan issued a report (the "JPM Report") announcing that ZTO and five other express delivery companies had agreed to raise last-mile delivery fees effective June 1, 2017.  (AC ¶ 71; Musoff Decl. Ex. M at 1.)  The JPM Report explained that the fee increase, which is "paid by first-mile pick-up partners and ultimately absorbed by consumers," was intended to "improve the profitability of last-mile delivery partners which are struggling with rising operating cost."  (Musoff Decl. Ex. M at 1.)  The JPM Report states that there was "a similar industry attempt to increase last-mile delivery fee[s] among the same six companies in 2015.  However, it turned out that cooperation among the six partners was not achieved."  (Id.)

Finally, on May 17, 2017, during an earnings call with investors and analysts, in response to a question about the decline in ZTO's gross profit margin in the first quarter of 2017, ZTO's Chief Financial Officer, Jianmin Guo, stated:

> "I would like to point out that the gross margin in Q1 this year and last year are not directly comparable. The reason is that during the second quarter of last year, we lowered the network transit fees we charge our network partners, and the change in the pricing has led to a reduction in the transit fee revenue per package. So because of this change, the quarterly revenue generated during the second quarter of last year is not comparable with that in the previous periods. And such pricing policy was changed in April last year. So the apple-to-apple comparisons will begin during the second quarter of this year."

(AC ¶ 73; Musoff Decl. Ex. J (the "1Q 2017 Earnings Call") at 10.)  Guo added that "what [ZTO] actually did in last Q2 is actually we bundle smaller packages into bigger

packages.  And as a result of this, there's some minor impact on the total pricing of the package."  (1Q 2017 Earnings Call at 11.)

Guo also stated on the May 17, 2017, earnings call that ZTO had adopted a number of "transportation cost control measures" in the first quarter of 2017, including increasing the number of self-owned vehicles, and increasing vehicle capacity by using self-owned–self-operated distribution centers where ZTO can arrange pickup and drop off times itself.  (AC ¶ 74; 1Q 2017 Earnings Call at 10.)  Guo explained that the increase in transportation costs during the fourth quarter of 2016 "was because [of] some one-off factors," such as the "imbalance between supply and demands of transportation capacity in the marketplace," which caused "third-party outsourcing costs [to] increase[] quickly."  (1Q 2017 Earnings Call at 10.)  Guo acknowledged that, while ZTO has "already bought more self-owned vehicles . . . we have not been able to recruit and train enough qualified drivers in a timely manner.  So we had to rely more on third-party trucking capacity in Q4 last year."  (Id.)  Finally, Guo stated that "depending on the situation, [ZTO] may provide small subsidies to some of these [last-mile] service outlets, but overall, the pickup outlets will have to bear the last mile delivery fee adjustment on their own."  (AC ¶ 75; 1Q 2017 Earnings Call at 11.)

Plaintiffs allege that ZTO's share price decreased following each of the aforementioned disclosures, and that Plaintiffs, as purchasers of ZTO American Depository Shares pursuant or traceable to the Offering Documents, have sustained damages as a result.  (AC ¶¶ 19-20, 77-78.)

DISCUSSION

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Under the Rule 12(b)(6) standard, the court accepts as true the nonconclusory factual allegations of the complaint and draws all reasonable inferences in the plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

Section 11 of the Securities Act imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C.S. § 77k(a) (LexisNexis 2012).  Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus.  15 U.S.C. § 77l(a)(2).  Section 15 of the Securities Act makes a "control person" liable for causing violations of Sections 11 and 12.  15 U.S.C. § 77o.  "Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010).

"In judging whether an alleged omission was material in light of the information already disclosed to investors, [courts in this Circuit] consider whether there is a <u>substantial</u> likelihood that the disclosure of the omitted material would have been viewed by the <u>reasonable</u> investor as having <u>significantly</u> altered the total mix of information already made available." <u>In re ProShares Trust Secs. Litig.</u>, 728 F.3d 96, 102 (2d Cir. 2013) (internal quotation marks omitted) (emphasis in original).  When cautionary language is present, the court must "analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled.  The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d 352, 357 (2d Cir. 2002).

<u>Statements Regarding ZTO's "Principal" Source of Revenues</u>

Plaintiffs argue that ZTO was required to disclose an April 2016 decrease in its network transit fees so as to not render materially misleading statements in its Offering Documents that ZTO's network transit fees are the "principal" source of ZTO's revenues. However, the AC contains no facts from which the Court can infer that the fee decrease had any effect, let alone a material effect, on the composition of ZTO's revenues such that network transit fees were no longer the "principal" source of ZTO's revenues after April 2016. Accordingly, the Court finds that Plaintiffs have not alleged plausibly that disclosure of the April 2016 network transit fee decrease was necessary to make statements regarding ZTO's "principal" source of revenue not misleading, and dismisses Plaintiffs' claims to the extent that they are based on those statements.

Statements Regarding ZTO's "Superior Profitability" and Operating Margin

Plaintiffs next argue that ZTO was required to disclose the April 2016 network transit fee decrease so as to not render materially misleading statements in its Offering Documents that ZTO had "achieved superior profitability" with an operating margin of 25.1% in 2015. Plaintiffs do not take issue with the calculation of ZTO's operating margins or revenues in any given year, but rather contend that failure to disclose the April 2016 fee decrease did not "provide the whole truth" about ZTO's financial condition to investors insofar as it did not inform investors that ZTO had "slashed" its primary source of revenue in the quarter immediately preceding its IPO. Plaintiffs' argument is unavailing. To the extent that Plaintiffs' claim is premised on ZTO's disclosure of accurate historical financial data, Plaintiffs have not alleged an actionable misstatement. See Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 Fed. App'x 32, 38 (2d Cir. 2012) ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").

To the extent that Plaintiffs contend the April 2016 fee decrease had an undisclosed material negative effect on ZTO's profitability, that argument is unsupported by the AC, which contains no allegations from which the Court can discern the magnitude of the fee decrease or its effect on ZTO's profitability. Citing Guo's May 17, 2017, earnings call statement that the fee decrease caused the quarterly revenue generated during the second quarter of 2016 to be "not comparable" with that in previous periods (1Q 2017 Earnings Call at 10), Plaintiffs argue that the April 2016 fee decrease was significant, and that it had an adverse effect on ZTO's profitability because it led to a reduction in transit fee revenue per package. However, Guo's statement that the fee decrease rendered revenue figures "not comparable" across quarters is

insufficient to support a plausible inference that the magnitude of the decrease itself was substantial, and Plaintiffs' repeated assertions that ZTO "slashed" its network transit fees are inconsistent with Guo's later statement that the decrease only resulted in "some minor impact on the total pricing of the package" and is not supported by any other factual allegation in the AC regarding the magnitude of the change. (1Q 2017 Earnings Call at 11.) Moreover, the effect of the fee decrease was disclosed to investors, who could simply divide ZTO's reported quarterly revenues by parcel volume to determine the reduction in transit fee revenue per package in the second quarter of 2016. (See Prospectus at 83; Reg. Stmt. at 83.) Thus, Plaintiffs have not alleged plausibly that, in light of the information already disclosed to investors, the omission of the April 2016 fee decrease was substantially likely to have significantly altered the total mix of information available to investors. Accordingly, Plaintiffs' Section 11 claims are dismissed to the extent that they are premised upon ZTO's failure to disclose the April 2016 fee decrease in connection with statements regarding its profitability and operating margin.[2]

Risk Disclosure Statements

In paragraphs 60 and 61 of the AC, Plaintiffs allege that statements warning investors of the risks associated with ZTO's inability to control its costs and adjust network transit fees, the potential for downward pricing pressure, and the possibility of subsidizing network partners were also misleading because ZTO failed to disclose that these risks had already materialized at the time of its IPO. Specifically, ZTO contends that these cautionary statements were insufficient to warn investors that (1) ZTO's profitability had been reduced by the April 2016 network transit fee decrease, (2) ZTO faced increasing transportation costs and

---

[2] For substantially the same reasons, claims premised on comparable statements in the AC related to ZTO's profitability are also dismissed. (See, e.g., AC ¶ 57.)

had to rely upon more costly third-party trucking companies, and (3) ZTO had attempted to negotiate a last-mile fee adjustment in 2015 to subsidize its network partners.

With respect to the network transit fee, as explained above, Plaintiffs have failed to allege facts sufficient to support a plausible inference that omission of the April 2016 fee decrease was material. Moreover, to the extent that Plaintiffs argue that the April 2016 fee decrease was indicative of undisclosed downward pricing pressure that existed prior to October 2016, multiple disclosures in the Offering Documents warned investors of that pressure and the need to adjust network transit fees in response. (See, e.g., Prospectus at 16, 19, 75, 117 (warning investors that there "have historically been declines in delivery service fees charged by our network partners," that ZTO "may face downward pricing pressure again," that ZTO has "been able to adjust the level of network transit fee[s] based on market conditions and operating costs," and that ZTO "may evaluate and adjust our service pricing from time to time."); Reg. Stmt. at 17, 20, 75, 117 (same).) Thus, the AC fails to state a claim based upon ZTO's alleged omission of the April 2016 fee decrease in connection with the risk disclosure statements identified in paragraphs 60 and 61 of the AC.

The same conclusion is warranted with respect to ZTO's alleged failure to disclose increased transportation costs. The Offering Documents contain several statements which warn investors that ZTO "must continually control our costs" to "maintain competitive pricing and enhance our profit margins," and that ZTO has "adopted various [cost-control] measures and will continue to add new ones as necessary and appropriate," even though "the measures we have adopted or will adopt in the future may not be as effective as expected." (Prospectus at 18-19, 76; Reg. Stmt. at 19, 76.) The Offering Documents also state that ZTO's line haul transportation costs increased by 64.1% in the first two quarters of 2016 as compared to

the same period in 2015, in line with an increase in parcel volume and "mainly attributable to increased costs . . . in outsourced transportation service, and increased costs . . . incurred by our self-owned fleet."  (Prospectus at 79; Reg. Stmt. at 79.)  Thus, the Offering Documents, when read in their entirety, also warn investors of increased transportation costs, including greater reliance upon third-party transportation services, as well as the risks associated with higher transportation costs in the future.  See Halperin, 295 F.3d at 361 (affirming dismissal of securities fraud claims where the "allegedly omitted facts were either disclosed or implied in the offering memoranda.").  To the extent that Plaintiffs contend that ZTO was required to disclose increases in transportation costs that occurred after its IPO, such as the increased use of third-party trucking companies in the fourth quarter of 2016, and the utilization of self-owned and operated distribution centers in the first quarter of 2017, ZTO could not have and was not required to "predict the precise manner in which the [disclosed] risks will manifest themselves." In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993); see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008) ("The securities laws do not require clairvoyance in the preparation of offering documents.").

Finally, with respect to the attempted negotiation of a last-mile fee adjustment in 2015, the AC contains no plausible factual allegations from which the Court can infer properly that disclosure of the negotiations, which took place the year before ZTO's IPO and resulted in no discernible subsidies to network partners, would have significantly altered the total mix of information already available to investors.  Plaintiffs argue that the "unsuccessful attempt to agree on subsidies in 2015 heightened management's sensitivity to the last-mile partners' inability to control their costs," but the AC contains no facts connecting the 2015 negotiation to last-mile partners' costs, nor would such facts render materially misleading a statement that ZTO

may "have to subsidize our network partners" in the future. Accordingly, the Court finds that the AC fails to state a claim under Section 11 based upon the alleged omission of the 2015 negotiation.

For the foregoing reasons, Plaintiffs Section 11 claims are dismissed to the extent that they allege that the risk disclosure statements identified in paragraphs 60 of the AC were materially misleading.[3]

Affirmative Disclosure Obligations Under Items 303 and 503 of Regulation S–K

Separately, Plaintiffs argue that ZTO had an independent obligation under Items 303 and 503 of SEC Regulation S–K to disclose: (1) the April 2016 network fee decrease, (2) increased transportation costs, and (3) the 2015 last-mile fee adjustment negotiation.[4] Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

---

[3] Plaintiffs make no attempt to address in their opposition to Defendants' motion to dismiss several additional statements alleged in the AC to be misleading in light of ZTO's failure to disclose the April 2016 network fee decrease, increased transportation costs, or the 2015 last-mile fee adjustment negotiation. (See AC ¶¶ 50, 55, 58, 59.) These statements relate to ZTO's "innovative shared success system," "highly scalable network partner model," "operational efficiency," and the "highly competitive and fragmented industry," in which ZTO operates, and do not appear to have any connection to the alleged omissions. In light of the Court's conclusion that the AC fails to allege plausibly that the alleged omissions were material, the Court also dismisses Plaintiffs' claims to the extent that they are based on these other additional statements.

[4] Plaintiffs also allege in the AC that ZTO had an affirmative obligation to disclose the exclusion of its independent network partners from its own financial statements, but do not make a similar assertion in their opposition to Defendants' motion to dismiss. (See AC ¶¶ 55, 62, 63.) Because ZTO plainly disclosed its network partner model and made clear in the Offering Documents that its consolidated financial statements only include the financial statements of ZTO, its subsidiaries, and affiliated entities, but not its network partners, the AC is dismissed to the extent that Plaintiffs' claims are premised upon that omission. (See Prospectus at 88; Reg. Stmt. at 88.)

revenues or income from continuing operations," and disclose "events that will cause a material change in the relationship between costs and revenues." 17 C.F.R. § 229.303(a)(3)(ii). Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3. Thus, Item 303 imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." Litwin v. Blackstone Group, L.P., 634 F.3d 706, 716 (2d Cir. 2011). Similarly, Item 503 of SEC Regulation S–K creates a duty to disclose "the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2018).[5] "The same facts underlying an Item 303 violation may also support an Item 503 violation, and a court's rationale for determining the former may also support the same determination of the latter." In re Barclays Bank PLC Sec. Litig., 09 Civ. 1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017).

Here, Plaintiffs have not alleged plausibly that ZTO had an affirmative obligation to disclose the April 2016 fee decrease because, as discussed above, the AC contains no facts from which the Court can infer that the decrease was so substantial that it could reasonably have been expected to have a material effect on ZTO's revenues or financial condition. Similarly,

---

[5] On March 20, 2019, after the instant motion was filed, the SEC adopted amendments to certain disclosure requirements in Regulation S-K, including Item 503. See FAST Act Modernization and Simplification of Regulation S-K, 2019 WL 1437180, at *12688-89 (Apr. 2, 2019). Pursuant to those amendments, Item 503(c) has been revised in respects not material to this motion practice and relocated to 17 C.F.R. § 229.105 and continues to require registrants to provide "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." See id. at *12716.

Plaintiffs identify no specific pre-IPO increase in transportation costs that is not already disclosed in the Offering Documents, and nothing in Item 303 requires ZTO to disclose in the Offering Documents trends and events that occurred after its IPO, such as its use of third-party trucking companies and self-owned and operated distribution centers in the fourth and first quarters of 2016 and 2017, respectively. Finally, the AC does not allege facts sufficient to support a plausible inference that the 2015 last-mile fee adjustment negotiation was reasonably likely to have any measurable, material impact on ZTO's revenues or operations. Because Plaintiffs have failed to identify any trends, events, or uncertainties that were not already disclosed in the Offering Documents and which would have had a material impact on ZTO's revenues or operations, Plaintiffs have not pleaded adequately that ZTO omitted information that it was required to disclose under either Item 303 or Item 503. See Hutchinson v. Deutsche Bank Sec. Inc., 647 F.3d 479, 484 n.4 (dismissing claims for violation of Item 503 where plaintiffs focused primarily on defendants' obligations under Item 303 and advanced no argument unique to Item 503).

Plaintiffs' Section 12 and 15 Claims

In light of the dismissal of Plaintiffs' Section 11 claims against Defendants, Plaintiffs' Section 12 and Section 15 claims, which rely on the same underlying factual allegations, must also be dismissed. See In re Lone Pine Res., Inc., No 12 CV 4839, 2014 WL 1259653, at *6 (S.D.N.Y. Mar. 27, 2014) ("A plaintiff who fails to plead a § 11 claim necessarily fails to plead a § 12(a)(2) claim as well."); Scott v. Gen. Motors Co., 46 F. Supp. 3d 387, 398 (S.D.N.Y. 2014), aff'd, 605 Fed. App'x 52 (2d Cir. 2015) (imposing control person liability

under Section 15 requires an underlying Section 11 or Section 12 violation by the controlled person).[6]

Leave to Amend

Plaintiffs request leave to amend the AC should the Court grant Defendants' motion. That request is granted in light of the "liberal amendment policy" embodied by Rule 15 of the Federal Rules of Civil Procedure. Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007).

---

[6] Because Plaintiffs have not pled facts sufficient to state a plausible claim for violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, the Court need not consider at this time Defendants' argument that negative causation bars the complaint. The Court notes, however, that because the parties dispute the dates and times at which certain corrective disclosures became publicly available, the Court cannot determine at this stage whether, as a matter of law, Plaintiffs fail to establish a causal relationship between Defendants' alleged misrepresentations and certain declines in ZTO's stock price.

CONCLUSION

For the foregoing reasons, Defendants' motion is granted and the Amended Class Action Complaint is dismissed in its entirety.  Plaintiffs may move for leave to amend by **August 7, 2019**.  Any such motion must comply with the Federal Rules of Civil Procedure, the Local Rules of this Court, and the individual rules of practice of the undersigned, and must be accompanied by a proposed amended complaint and a blacklined version of that proposed complaint showing all changes from the AC.  If Plaintiffs do not file a timely motion for leave to amend, the dismissal of the AC against Defendants will be with prejudice and judgment dismissing the AC will be entered without further advance notice.  This Memorandum Opinion and Order resolves docket entry no. 60.


SO ORDERED.

Dated: New York, New York
　　　 July 17, 2019

　　　　　　　　　　　　　　　　　　　　　　　　　　　　/s/ Laura Taylor Swain
　　　　　　　　　　　　　　　　　　　　　　　　　　　　LAURA TAYLOR SWAIN
　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge