UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RUSTEM NURLYBAYEV, Individually and
On Behalf of All Others Similarly Situated,

Plaintiff,

v.

ZTO EXPRESS (CAYMAN) INC., MEISONG
LAI, JIANFA LAI, JILEI WANG,
XIANGLIANG HU, BAIXI LAN, ZING LIU,
FRANK ZHEN WEI, and JIANMIN (JAMES)
GUO, J.P. MORGAN SECURITIES LLC,
CREDIT SUISSE SECURITIES (USA) LLC,
CITIGROUP GLOBAL MARKETS INC.,
CHINA RENAISSANCE SECURITIES
(HONG KONG) LIMITED, GOLDMAN
SACHS (ASIA) L.L.C., AND MORGAN
STANLEY & CO. INTERNATIONAL PLC,

Defendants.

Case No. 1:17-cv-06130-LTS-SN

**MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE
THE [PROPOSED] SECOND
AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................................1

II.   PROCEDURAL HISTORY.......................................................................................5

III.  LEGAL STANDARD.................................................................................................5

IV.   ARGUMENT ............................................................................................................6

      A.    Plaintiffs Have Not Engaged in Undue Delay, Bad Faith, Dilatory
            Motive, or Repeated Failure to Cure Deficiencies...................................................6

      B.    The PSAC Causes No Undue Prejudice to Defendants ............................................6

      C.    New Allegations in the PSAC Address the Deficiencies Identified
            in the MTD Order, Demonstrating That Amendment Is Not Futile ........................7

            1.    The PSAC Includes New Allegations Showing That the
                  Registration Statement Manipulated Corporate Earnings............................7

            2.    The PSAC Includes New Allegations Demonstrating the
                  Effect of the Network Transit Fee Decrease on ZTO's
                  Margins ..........................................................................................................9

            3.    The PSAC Includes New Allegations Showing that the
                  Effect of the Fee Decrease Was Not Disclosed ............................................9

            4.    The PSAC Includes New Allegations Showing that
                  Materiality of the Omission of the Fee Decrease.......................................10

            5.    The PSAC Includes New Allegations Showing Risk
                  Disclosures Did Not Inform Investors that ZTO Had
                  Reduced Network Transit Fees in April 2016 ...........................................11

            6.    The PSAC Includes New Allegations Concerning the Basis
                  for Finding a Violation of Item 303 ...........................................................13

V.    CONCLUSION........................................................................................................14

010714-11/1188534 V1

Pursuant to Federal Rule of Civil Procedure 15(a)(2) and the Court's July 17, 2019

Memorandum Opinion and Order (ECF No. 86) ("MTD Order") granting Defendants'[1] motion to

dismiss plaintiffs' Amended Class Action Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6), Lead Plaintiff the Wong Family Trusts and plaintiff Dongna Fang ("Plaintiffs") submit

this memorandum of law in support of their motion for leave to file the [Proposed] Second

Amended Class Action Complaint (attached as Exhibit A to the Declaration of Reed R. Kathrein

in Support of Plaintiffs' Motion for Leave to File the [Proposed] Second Amended Class Action

Complaint ("Kathrein Decl.").[2]

## I.     INTRODUCTION

Federal Rule of Civil Procedure 15(a)(2) instructs that leave to amend shall be freely

given when justice requires, a standard the Second Circuit has emphasized is "'permissive'" and

"liberal." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir.

2015).[3]  Plaintiffs' PSAC more than meets the requirements set forth by Rule 15(a)(2) and

governing case law.  Plaintiffs request that the Court grant their motion for leave.

Leave to amend is generally granted unless one of three circumstances exists.  None of

the three is present here.  First, there is no question that Plaintiffs have not engaged in undue

delay or bad faith, nor can there be any suggestion that they have acted with a dilatory motive or

---

[1] As used herein, "Defendants" refers collectively to: ZTO Express (Cayman) Inc. ("ZTO" or the "Company"); Morgan Stanley & Co. International plc, Goldman Sachs (Asia) L.L.C., China Renaissance Securities (Hong Kong) Limited, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, and J.P. Morgan Securities LLC (the "Underwriter Defendants"); and Meisong Lai, Jianfa Lai, Jilei Wang, Xiangliang Hu, Baixi Lan, Xing Liu, Frank Zhen Wei, Jianmin (James) Guo (the "Individual Defendants").

[2] Also pursuant to the MTD Order, Plaintiffs have attached as Exhibit B to the Kathrein Decl. a blacklined version of the proposed complaint showing all changes from the Amended Class Action Complaint.  MTD Order at 17.

[3] Citations and footnotes omitted and emphasis added unless otherwise indicated.

- 1 -

repeatedly failed to cure deficiencies.  To the contrary, Plaintiffs seek to amend the complaint for

the first time after the Court's MTD Order, and are doing so at the Court's explicit invitation by

the Court-approved deadline stipulated to by the parties.

Second, there is no undue prejudice to Defendants.  This motion will only lead to the

expenditure of additional discovery- and trial-related expenses if the Court deems Plaintiffs'

PSAC sufficient to state a claim.  Defendants will not be hindered in their preparation of their

case or be prevented from taking any measure in support of their position.  Any prejudice

resulting from successfully amended allegations would not be undue.

Third, because the allegations set forth in the PSAC are tailored to address the key issues

identified by the Court's MTD Order granting Defendants' motion to dismiss Plaintiffs'

Amended Class Action Complaint (ECF No. 52) ("AC"), amendment is not futile.  The PSAC

streamlines Plaintiffs' allegations by no longer alleging certain statements pled in the AC to be

misleading.[4]  And, regarding the remaining misrepresentations, the PSAC pleads additional facts

in response to the concerns that animated the Court's order dismissing the AC.

---

[4] Plaintiffs have streamlined the complaint by removing allegations that the following statements, pled in the AC, were false and misleading:

> "Our revenues are primarily driven by our parcel volume and the network transit fee we charge our network partners for each parcel going through our network." AC ¶ 56.

> "We have achieved superior profitability along with our rapid growth."  AC ¶ 57.

> "If we and our network partners cannot effectively control our costs to remain competitive, our market share and revenue may decline."  AC ¶ 60.

> "[I]f we have to subsidize our network partners to increase our network partners' competitiveness, our gross margin may decline."  *Id.*

> ZTO's "innovative shared success system," "highly scalable network partner model," and "operational efficiency," and the "highly competitive and fragmented industry" in which it operates. AC ¶¶ 50, 55, 58, 59.

> In addition, Plaintiffs no longer plead that the network transit fee decline (AC ¶¶ 7, 51, 73), out of control transit costs (AC ¶¶ 9, 52, 74), or last-mile fee

For example, the PSAC includes new allegations that the Registration Statement included financials that were made more appealing to investors through off-the-books transactions not fully-disclosed to investors.  Specifically, the PSAC alleges that ZTO made millions in pre-IPO, 1H16 payments to related a party, the trucking company Tonglu Tongze Logistics Ltd. ("Tonglu").[5]  ¶¶ 55-64.[6]  It alleges that those payments were unusual – both in type (immediately vesting shares) and occurrence (in lieu of normal cash-based payments).  *Id*.  And it alleges that the payments were used to enable ZTO to report lower expenses, and therefore higher profits and margins –key metrics to investors considering whether to purchase IPO shares.  *Id.*

The PSAC also includes new allegations substantiating the reduced network transit fees' effect and materiality on ZTO's financial results. It alleges that the network transit fee decline had a substantial effect on ZTO's margins: whereas analysts expected gross profit margins to increase over time – from 34.3% in 2015, to an expected 34.5% in 2016, to an expected 36.4% in 2017 (¶ 80) – they in fact declined from 38.1% in 4Q15 to 36.4% in 4Q16, and again from 30.7% in 1Q16 to 27.9% in 1Q17.[7]  ¶¶ 82, 87-95.  Moreover, both analysts and Company executives primarily ascribed the 1Q17 margin declines to the previously unreported network transit fee reduction.  ¶¶ 87-93, 103 (ZTO and executives); ¶¶ 95-97, 103 (analysts).  Thus, the PSAC alleges facts identifying the reduced fee's material effect on ZTO's financial results.

---

adjustments (AC ¶¶ 10, 53-54, 71, 75) were required to be disclosed under Item 303.

[5] ZTO's fiscal quarters are referenced herein as follows: "1Q" means first quarter, "2Q" means second quarter, "3Q" means third quarter, and "4Q" means fourth quarter.  "1H" means first half of the fiscal year (the first and second quarters combined).  "FY" means fiscal year. The two digits following the prior described abbreviations indicate the year.  Thus, for instance, 4Q16 means fourth quarter of fiscal year 2016.

[6] All "AC ¶ __" citations herein are to the AC.  All "¶ __" and "§ __" citations herein are to the PSAC.

[7] 4Q16 and 1Q17 were ZTO's first two post-IPO quarters.

The PSAC also clarifies that investors could not determine the network transit fee reduction by dividing the disclosed quarterly revenue by quarterly parcel volume because ZTO had additional sources of revenue.  ¶ 51.  Further, if investors undertook the proposed calculation, they would have been misled into believing that the network transit fee for 2Q16 had increased, not decreased, year-over-year.  ¶¶ 50, 52.

And the PSAC pleads new facts and adds a section to demonstrate the materiality of the omissions.  § VIII; *see also* ¶¶ 76-98.  The Registration Statement itself boasted that ZTO's margin was one of "the highest among the major publicly listed logistics companies globally" and analyst reports following the IPO based their investment advice on ZTO's margins, which were expected to grow due to stable network fees.  ¶¶ 45, 77-81, 100.  When ZTO reported margin declines for 4Q16, analysts speculated that ZTO may have used off-the-books transactions with Tonglu in order to "temporarily concentrate[]" profits in ZTO "to help with the IPO."  ¶¶ 84-85, 102.  When ZTO again reported declining margins for 1Q17, analysts and the Company itself attributed the decline to the April 2016 network transit fee reduction.  ¶¶ 87-97, 103.  Thus, both the network transit fee reduction and the off-the-books payments directly affected metrics that drove analyst coverage and ZTO's share price.

These additional facts substantiate that investors were misled by the statements in the PSAC  that  failed to disclose the 2016 network transit fee decline and the off-the-books share-based payments to Tonglu.  The Tonglu-based allegations are made for the first time in the PSAC.  The additional facts also substantiate the Item 303 allegation regarding the uncertain effects on ZTO's financials of the newly-alleged share-based payments to Tonglu, and the Item 503 allegation regarding the risk warning about potential network transit fee declines.  In light of

the liberal standard for granting leave to file an amended complaint, the Court should permit

Plaintiffs to file the PSAC.

## II.    PROCEDURAL HISTORY

On January 8, 2018, Plaintiffs filed the AC on behalf of all persons who purchased or

otherwise acquired ZTO American Depositary Shares pursuant or traceable to the F-1

registration statement and the incorporated and *in pari materia* F-6 registration statement and

prospectus (collectively, the "Registration Statement") issued in connection with ZTO's October

2016 initial public stock offering.  ECF No. 52.  On February 20, 2018, Defendants jointly filed a

motion to dismiss the complaint.  ECF Nos. 60, 61.  On July 17, 2019, the Court issued the MTD

Order granting in full Defendants' Rule 12(b)(6) motion to dismiss the AC and stating that

Plaintiffs may move for leave to amend.  ECF No. 86.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give

leave [to amend] when justice so requires."  *See also Ruotolo v. City of New York*, 514 F.3d 184,

191 (2d Cir. 2008).  Leave to amend is generally granted absent: (1) undue delay, bad faith,

dilatory motive, or repeated failures to cure deficiencies; (2) undue prejudice to the opposing

party; or (3) futility.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Pfizer Inc. Sec. Litig.*,

2012 WL 983548, at *2 (S.D.N.Y. Mar. 22, 2012).  A "plaintiff typically will not be precluded

from amending a defective complaint in order to state a claim on which relief can be granted."

6 Charles Alan Wright, Arthur K. Miller & Mary Kay Kane, Federal Practice and Procedure

§ 1487 (3d ed. 2010).

The Second Circuit recently reiterated its longstanding "'strong preference'" for the

"'permissive'" and "liberal standard set forth in Rule 15."  *Loreley*, 797 F.3d at 190.  Indeed, the

Second Circuit highlighted the importance of receiving a "definitive ruling" from a district court

in order to inform amendment: "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Id.*

## IV.    ARGUMENT

### A.    Plaintiffs Have Not Engaged in Undue Delay, Bad Faith, Dilatory Motive, or Repeated Failure to Cure Deficiencies

Plaintiffs have not engaged in undue delay or acted in bad faith or with dilatory motive in moving for leave to file the PSAC.  The Court issued its MTD Order dismissing the AC less than two months ago, in which it invited Plaintiffs to move for permission to amend.  ECF No. 86. As discussed in *Loreley*, absent the benefit of the MTD Order, Plaintiffs did not see the necessity of amendment and were not in a position to weigh the practicality and possible means of curing specific deficiencies.  *Loreley*, 797 F.3d at 190.  Nor have Plaintiffs repeatedly failed to cure deficiencies; this is Plaintiffs' first request to amend.

### B.    The PSAC Causes No Undue Prejudice to Defendants

The Second Circuit instructs that three factors must be considered to assess whether undue prejudice exists: (1) whether amendment will "require the opponent to expend significant additional resources to conduct discovery and prepare for trial"; (2) whether it will "significantly delay the resolution of the dispute"; and (3) whether it will "prevent the plaintiff from bringing a timely action in another jurisdiction."  *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).  None of the factors counsel in favor of finding undue prejudice here.

No additional resources regarding discovery will be required; Defendants have not answered a complaint in this action and no discovery has been served.  Amendment will delay resolution of the dispute only insofar as Plaintiffs' amendment is successful, which would reflect justified, not undue, prejudice.  And Plaintiffs, including a lead plaintiff appointed by the Court

- 6 -

to file the complaint in this jurisdiction on behalf of the putative class, do not contemplate bringing an action in any other jurisdiction.

**C.      New Allegations in the PSAC Address the Deficiencies Identified in the MTD Order, Demonstrating That Amendment Is Not Futile**

The PSAC addresses the key deficiencies identified in the MTD Order, thereby demonstrating that amendment is not futile.  The proposed amendments streamline the allegations, dropping some of the statements previously alleged to have been materially misleading; clarify the allegations that remain to answer specific deficiencies identified by the Court in the MTD Order; and plead additional facts in support of the allegation that the statements that remain in the PSAC were materially misleading to reasonable investors.

"If the plaintiff has 'at least colorable grounds for relief,' justice requires granting leave to amend." *Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, 2017 WL 3726754, at *2 (S.D.N.Y. Aug. 28, 2017) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984)).  The movant need not show a probability of success, but only that they are not clearly frivolous on their face.  *Illco Toy Co. v. Block*, 1992 WL 80627, at *2 (S.D.N.Y. Apr. 3, 1992) (citing cases); *see Gopysingh v. Santiago*, 2001 WL 1658280, at *2 (S.D.N.Y. Dec. 26, 2001) ("there is no requirement that the party seeking leave to amend demonstrate that it will prevail on the merits").  The party opposing a motion for leave to amend bears the burden of establishing that amendment would be futile.  *Waterford Township Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2017 WL 395206, at *1 (S.D.N.Y. Jan. 27, 2017), *aff'd*, 723 F. App'x 20 (2d Cir. 2018).

**1.      The PSAC Includes New Allegations Showing That the Registration Statement Manipulated Corporate Earnings**

In the MTD Order, the Court found unavailing Plaintiffs' claim that statements about ZTO's gross margins were materially misleading because omissions cannot render misleading

- 7 -

"'the reporting of unmanipulated corporate earnings.'"  MTD Order at 9.  The PSAC includes

new factual allegations that the financial results reported in ZTO's Registration Statement were

manipulated.

The PSAC alleges that ZTO used off-the-books share-based payments that enabled the

presentation of more robust earnings and margins than would have been presented to investors

using standard accounting.  ¶¶ 46, 55-64.  These share-based payments to one of ZTO's trucking

vendors, Tonglu, were a departure from the standard practice of making cash-based payments to

Tonglu.  ¶ 55, 57, 59-60.  Unusually, the share-based payments vested immediately.  ¶¶ 55, 58-

61.  And, because Tonglu was substantially owned by ZTO insiders, ZTO did not need to seek

approval for the change in the manner of payment.  ¶ 56.  The payments had the effect of moving

payments that would normally be booked as cash expenses off of ZTO's books, thereby

decreasing expenses, inflating earnings, and inflating margins.  ¶¶ 55, 58, 60, 64.

The PSAC also pleads facts showing that investors were materially misled by these

payments.  After the IPO, analysts noted that the nature of the relationship between ZTO and

Tonglu remained "maddeningly unclear" and began to "suspect" that "ZTO could have exploited

its unusual relationship with related party [Tonglu] to understate reported costs (and thus

overstate earnings)."  ¶¶ 62-63.  Indeed, one research group stated that the Company's "returns

[were] probably engineered to maximise IPO pricing," continuing: "The relationships between

ZTO Express, Tonglu Tongze and its network partners are unclear, which suggests profits may

have been temporarily concentrated in the listed entity to help with the IPO."  ¶ 86, 102.

Temporarily concentrating profits to help with the IPO made the financial results reported in

ZTO's Registration Statement materially misleading.

### 2. The PSAC Includes New Allegations Demonstrating the Effect of the Network Transit Fee Decrease on ZTO's Margins

The Court held that the AC "contains no allegations from which the Court can discern the magnitude of the fee decrease or its effect on ZTO's profitability." MTD Order at 9. The PSAC pleads additional factual allegations demonstrating the decreased network transit fees had a material, negative effect on ZTO's margins. Specifically, when ZTO reported that its gross margin, a measure of the Company's profitability, had declined to 27.9% in 1Q17 from 30.7% in 1Q16. ¶¶ 87, 89, 92-93, 95-96, 103. ZTO, its executives, and analysts ascribed the declining profitability to the undisclosed April 2016 reduction in network transit fees. ¶¶ 87, 89-90, 93, 95-97. As such, the PSAC addresses the material effect of the network transit fee decrease on ZTO's profitability.

### 3. The PSAC Includes New Allegations Showing that the Effect of the Fee Decrease Was Not Disclosed

The MTD Order found that "the effect of the fee decrease was disclosed to investors, who could simply divide ZTO's reported quarterly revenues by parcel volume to determine the reduction in transit fee revenue per package in the second quarter of 2016." MTD Order at 10. Newly alleged facts demonstrate that this calculation would not suffice to identify the effect of the fee decrease for two reasons.

First, though investors could calculate revenue per parcel on a quarterly basis from 1Q15 through 2Q16, the quarter in which ZTO reduced network transit fees, the result would not accurately reflect the network transit fee. ¶ 51. Network transit fees reflected the substantial majority of, but not all, revenues derived from "express delivery services." *Id.* And ZTO's revenues were comprised not only of express delivery services but also "sale of accessories." *Id.* The amount of ZTO's revenues derived from express delivery services and sale of accessories, respectively, was not disclosed on a quarterly basis in the Registration Statement. *Id.* Rather,

- 9 -

they were disclosed on an annual and half-year basis.  *Id.*  As such, the quarterly calculation of revenue per parcel would not suffice to disclose the network transit fee.  *Id.*

Second, even assuming the calculation of quarterly revenue per parcel was an informative proxy for network transit fee, the resulting calculation would not have informed investors that ZTO reduced the fee in April 2016.  The year-over-year comparison in revenue per parcel shows that revenue per parcel **increased (not decreased)** from 2Q15 to 2Q16.  ¶¶ 50, 52.  But ZTO executives would later reveal that the Company had **reduced** fees in April 2016, the beginning of 2Q16.  ¶ 52.  Since executives and analysts focused on year-over-year comparisons, calculating revenue per parcel would have hidden, not disclosed, the existence of the April 2016 network transit fee reduction.  *Id.*  The PSAC therefore pleads new facts showing that investors could not determine the effect of the network transit fee decrease by referencing the quarterly revenues and parcel volume reported in the Registration Statement.

### 4.     The PSAC Includes New Allegations Showing that Materiality of the Omission of the Fee Decrease

The MTD found that the AC "failed to allege facts sufficient to support a plausible inference that the omission of the April 2016 fee decrease was material."  MTD Order at 11.  The PSAC includes a new section demonstrating the materiality of Defendants' omissions.  § VIII.

The Prospectus boasted that, in 2015, ZTO's operating margin was "one of the highest within the company's main peer group."  ¶ 45.  Analysts following the Company expected network transit fees to "stay[] largely stable" and would continue to drive gross profit margin expansion, from 34.3% in 2015 to 36.4% in 2017.  ¶ 100.

Unbeknownst to analysts or investors, however, ZTO had already decreased the network transit fees in April 2016.  ¶ 103.  And, unbeknownst to analysts or investors, the decrease in network transit fees had, even before the IPO, already made post-reduction margins not directly

comparable to those from before.  *Id.*  Thus, at the time analysts believed network transit fees to "stay largely stable" and that network transit fees would drive margin expansion, the fees and margins had already declined.

The PSAC also alleges that when ZTO reported the negative margin growth, analysts took note, attributed the negative results to the previously undisclosed decline in network transit fees, and registered their concern about the stock, with one saying that the gross profit margin contraction "was even worse than our low expectation."  ¶ 97.  When ZTO reported that its gross margin had declined to 27.9% in 1Q17 from 30.7% in 1Q16, it blamed the previously undisclosed April 2016 reduction in network transit fees. ¶ 103.

As ZTO's executives conceded, the undisclosed network transit declines made the margins reported to investors in the Registration Statement misleading to investors trying to use those numbers to understand the ramifications for future results: margins from 1Q16 were "not directly comparable" to 1Q17 margins for reasons that existed as of April 2016, before the IPO. ¶ 103.  If the margins reported in the Registration Statement would not be directly comparable on a year-over-year basis after the IPO for reasons that existed at the time of the IPO, the Registration Statement was required to say so.  Because it did not, it was materially misleading.

5.    **The PSAC Includes New Allegations Showing Risk Disclosures Did Not Inform Investors that ZTO Had Reduced Network Transit Fees in April 2016**

The MTD Order also found that "multiple disclosures in the Offering Documents warned investors of … the need to adjust network transit fees."  MTD Order at 11.  The PSAC pleads additional facts demonstrating that, while the disclosures identified by the Court may have informed investors of the "historical" and "potential" future need to adjust transit fees (*id.*), those disclosures were not sufficient to put them on notice of the April 2016 network transit fee decline and its material effects on the Company's financials.

- 11 -

For example, shortly after the IPO analysts at Credit Suisse, fully aware of the risk disclosures in the Registration Statement, stated that they expected "income from transit service fees" to stay "largely stable."  ¶ 78.  The same analyst report included charts demonstrating the analysts' expectation that ZTO's gross profit margin would continue to expand on the back of network transit fees.  ¶¶ 79-80.  Analysts at J.P. Morgan focused on ZTO's "pricing power over … the network transit fees."  ¶ 81.

When ZTO subsequently reported reduced margins, not just analysts but Company executives themselves ascribed the decline to the April 2016 reduction in network transit fees. ¶¶ 87-90, 93, 95-97.  Stock prices fell as a result.  ¶ 103.  Had the risk disclosures truly made investors and analysts aware of the facts existing at the time of the IPO – namely, that, six months before the IPO, the Company had reduced network transit fees substantially enough that pre-reduction margins were "not directly comparable" to margins post-reduction – analyst reports would have referenced that the Company had warned of this actuality.  Instead, no analyst discussed the network transit fee reduction or that it would make year-over-year margin comparisons not directly comparable until ZTO's May 17, 2017, disclosure that it had network transit fees in April 2016.  *See generally* ¶¶ 77-86, 100-102.  The stock price reaction to this disclosure and analyst commentary about it show that the market did not understand that a recent network price decline would materially affect the Company's performance.  ¶ 94-98, 103.

These newly pled facts also support the allegation that the Registration Statement violated Item 503 of SEC Regulation S-K.  ¶¶ 73-75.  The omission of a specific warning about the actual recent network fee reduction made investment in ZTO speculative or risky because it gave reasonable investors the misleading impression that there was no known, present risk to the

Company's financial results of operations arising from an actual, known reduction of network transit fees, ZTO's principal source of revenues.

### 6. The PSAC Includes New Allegations Concerning the Basis for Finding a Violation of Item 303

The MTD Order found the AC did not plausibly allege that Defendants had an affirmative obligation under Item 303 of SEC Regulation S-K to disclose the April 2016 network fee decrease, ZTO's increased transportation costs, and the 2015 last-mile fee adjustment negotiation. MTD Order at 13-15. The PSAC does not re-plead those allegations. But it pleads facts supporting a new basis for finding that the Registration Statement omitted facts required to be disclosed under Item 303: the omission of the fact that ZTO had used share-based payments to Tonglu in 1H16 to reduce reported costs, increase earnings, and improve margins. ¶¶ 70-72.

The omitted fact that ZTO had used share-based payments to Tonglu in 1H16 was required to be disclosed because it: (i) was known to the ZTO; and (ii) created a material uncertainty concerning, and might reasonably be expected to have a material impact, on ZTO's future financial information. ¶ 71. In contrast to the share-based payments of more than 120 million Renminbi in 1H16, ZTO made only 0.25 million Renminbi worth of share-based payments in each of the subsequent three quarters, a 99.79% reduction in the use of such payments. *Id.* The pre-IPO use of share-based payments enabled ZTO to treat payments for the trucking services provided by Tonglu as non-cash expenses. ¶¶ 55-64, 71. In turn, this enabled ZTO to report lower costs, higher earnings, and better margins than it would have done had the payments to Tonglu been treated as cash payments – as they were after the IPO. ¶¶ 58-59.

The omission of the share-based, off-the-books payments therefore created for reasonable investors the misleading impression that there did not exist any known trends, demands, commitments, events or uncertainties that were expected to have an unfavorable impact on

- 13 -

revenues or income from continuing operations, or concerning which ZTO could not rule out such an impact. ¶ 72.

## V.    CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for leave to file the PSAC.  Plaintiffs have not sought any unfair advantage; Defendants have not been unduly prejudiced; and amendment is not futile, as the PSAC addresses the deficiencies the Court identified in its order dismissing the AC.

DATED:  September 10, 2019                 Respectfully Submitted,

                                           HAGENS BERMAN SOBOL SHAPIRO LLP

                                           By ____/s/ Reed R. Kathrein_____
                                           Reed R. Kathrein (admitted *Pro Hac Vice*)

                                           Danielle Smith
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           715 Hearst Avenue, Suite 202
                                           Berkeley, CA 94710
                                           Telephone: (510) 725-3000
                                           Facsimile:  (510) 725-3001
                                           reed@hbsslaw.com
                                           danielles@hbsslaw.com

                                           Steve W. Berman
                                           Karl Barth
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1918 Eighth Avenue, Suite 3300
                                           Seattle, WA 98101
                                           Telephone: (206) 623-7292
                                           Facsimile:  (206) 623-0594
                                           steve@hbsslaw.com
                                           karlb@hbsslaw.com

                                           *Lead Counsel for Lead Plaintiff, Wong Family Trusts*

- 14 -

James I. Jaconette
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
jamesj@rgrdlaw.com

Shawn A. Williams
Matthew S. Melamed
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile:  (415) 288-4534
shawnw@rgrdlaw.com
mmelamed@rgrdlaw.com

*Additional Counsel*

Thomas L. Laughlin, IV
Donald A. Broggi
Rhiana L. Swartz
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
rswartz@scott-scott.com

*Counsel for Dongna Fong*

- 15 -

**CERTIFICATE OF SERVICE**

I hereby certify that I am the ECF User whose ID and password are being used to

electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which

will send notification of such filing to the e-mail addresses registered, as denoted on the

Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of

the foregoing document via the United States Postal Service to the non-CM/ECF participants

indicated on the Manual Notice List generated by the CM/ECF system.

/s/ Reed R. Kathrein
REED R. KATHREIN

010714-11/1188534 V1